MEYERS LAW GROUP, P.C.
MERLE C. MEYERS, ESQ. CA Bar #66849
MICHELE THOMPSON, ESQ. CA Bar #241676
44 Montgomery Street, Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Facsimile: (415) 362-7515

Prospective Counsel for Debtor,
KINEMED, INC., a Delaware Corporation

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>KINEMED, INC., a Delaware corporation,<br><br>Debtor.<br><br>Federal Tax I.D. No.: 91-2104596 | Case No. 14-41241-RLE<br><br>Under Chapter 11<br><br>Date: May 11, 2016<br>Time: 2:00 p.m.<br>Place: U.S. Bankruptcy Court<br>Courtroom No.220<br>1300 Clay Street<br>Oakland, California<br>Judge: Hon. William J. Lafferty III |

**DEBTOR'S MOTION FOR AUTHORITY TO
(A) OBTAIN SECURED POSTPETITION FINANCING; AND (B)
GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS**

KINEMED INC., a Delaware corporation and the debtor-in-possession herein (the "Debtor"), hereby moves the Court, pursuant to Sections 364(c)(1), (2) and (3) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an interim order, substantially in the form attached hereto as **Exhibit "A"** (the "Interim Order"), subject to entry of a final order, permitting the Debtor (a) to obtain secured postpetition financing (the "DIP Loan"), pursuant to the terms of the Binding Term Sheet For Postpetition Financing (the "Term Sheet") attached to the declaration of David M. Fineman (the "Fineman Dec.") as **Exhibit "A,"** up to the amount of $1,000,000, to finance general operations and the marketing and sale of assets of the Debtor; and (b) to grant postpetition liens and a superpriority claim to secure such financing.

In support of this motion (this "Motion"), the Debtor respectfully represents as follows:

## I. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are Sections 105(a), 364, 1107(a), and 1108 of the Bankruptcy Code.

## II. STATEMENT OF FACTS

The following facts are established by the record of this Court and as well as the Fineman Dec. David M. Fineman is the Debtor's Chief Executive Officer and Chairman of the Board of Directors.

### A. The Debtor's History and Background

1. The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 4, 2016 (the "Petition Date"). The Debtor continues to operate its business as a debtor in possession pursuant to the provisions of Sections 1107(a) and 1108 of the Bankruptcy Code, no trustee having been appointed.

2. The Debtor, founded in 2001, is incorporated under the laws of the State of Delaware, and operates from its principal place of business located in Emeryville, California.

### B. Dynamic Proteomics Biomarker Platform

3. The Debtor provides services to the pharmaceutical industry by applying its proprietary dynamic proteomics biomarker platform technology (the "Dynamic Proteomics Platform") to develop drugs more efficiently and with less risk. This Dynamic Proteomics Platform rapidly detects a medicine's target engagement (whether the drug hitting the right target), tracks disease progression (whether the drug is continuing to work), and provides data that is highly predictive of late-stage success. The Debtor is focused on muscle-wasting disease and fibrotic diseases. Its platform is broadly applicable to prescription and non-prescription medical diagnostics, and the pairing of drugs with diagnostic biomarker tests.

4. The Debtor's measurements capture non-invasively the rates of change of complex biological processes that drive processes of disease or health in humans and animals. Samples are

taken in small amounts of blood, bodily fluids or tissue. Descriptively, the molecular biochemistry behind these kinetic measurements is based upon the body's metabolic incorporation of safe, non-radioactive tags into newly synthesized molecules through disease-modifying pathways. The rates, or activity, of these disease-modifying metabolic pathways are measured by highly sensitive mass spectrometric analytic techniques. This information is used to rapidly pinpoint and detect target engagement of therapeutics, track disease progression and early-on predict later stage proof-of-concept or clinical success.

5. Biomarkers are measurable characteristics about the state of a living organism that are relevant to health and disease. The Debtor believes that biomarker tests that dynamically identify the cause of a disease and monitoring over time the activity of the biological processes of health and disease in an individual, can fundamentally change the management of disease. As a result, the biomarker tests have the potential to have a transformative effect on healthcare by providing information that can be used to make drug development more efficient, to increase markets and sales for medicines and other health-related products, and to guide actionable healthcare decisions by physicians and wellness decisions by consumers.

6. The technology developed by the Debtor is the first practically useful biomarkers technology that can be used directly in humans, with applications not only in drug discovery and development, but also in clinical diagnosis, personalized medicine and therapeutic monitoring, including over-the-counter wellness decisions.

7. The Debtor has an extensive record of collaborating with pharmaceutical companies and others to apply their biomarkers to drug development, and has operated several programs based on the Debtor's novel approaches to disease identification and treatment including: drug discovery and development; prescription and non-prescription diagnostic tests; diagnostic testing; and drug pairings across a wide range of disease states.

8. Through these types of programs, the Debtor and its co-development partners have worked to improve drug development efficiency, through research and development arrangements, milestone-based collaborations, and Center-of-Excellence programs administered by the U.S. Department of Health and Human Services.

3
DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING AND GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS
20130.DOC/20130
Case: 16-41241  Doc# 17  Filed: 05/06/16  Entered: 05/06/16 14:04:41  Page 3 of 19

9. The Debtor's proprietary measurements are geared to provide personalized information about key biologic processes, to allow precision medical management based on disease subtype and activity, and to enable informed wellness decisions based on what is needed and what is working in each person.

10. The Dynamic Proteomics Platform, comprising 80 issued world-wide patents in 16 patent families, is based in part upon an exclusive license of patents obtained from the University of California at Berkeley. That license is in good standing and is assignable by the Debtor under certain circumstances.

11. The Debtor has used its Dynamic Proteomics Platform to enter into more than 100 revenue-generating collaborations with pharmaceutical and biotechnology companies, in addition to more than a dozen revenue-generating collaborations with non-profit foundations and agencies. The Debtor's collaborators have included Glaxo Group Limited, Pfizer Inc., and Amgen Inc., as well as the National Institutes of Health, and medical research foundations such as the Michael J. Fox Foundation, the Cure Huntington's Disease Initiative Foundation, and the Susan G. Komen Breast Cancer Foundation.

## C. Fee-For-Service Business

12. Until recently, the Debtor used its Dynamic Proteomics Platform to provide fee-based services to various pharmaceutical development partners in the testing and development of those partners' drugs.

13. However, the Debtor has determined that it lacks the resources and ability to operate those fee-based services on a profitable basis, given the low margins possible in a competitive field. The Debtor therefore sought to market and sell its fee-based service business to one of many "contract research organizations," or "CROs," which provide such services to pharmaceutical companies on a large-volume basis. In the process of marketing that business, as directed by Sage Healthcare Group, a firm focused on transactional and strategic advice to healthcare and life science companies, the Debtor contacted more than 40 CROs and related companies, developed and gave access to an extensive digital data room, and entered into nondisclosure agreements and serious discussions with eight prospective bidders.

14. Unfortunately, that process, which occurred in late 2015 and early 2016, did not result in any acceptable offers for the purchase of the Debtor's fee-for-service business. The Debtor therefore discontinued the marketing effort and wound down that business by April 2016.

15. Instead, the Company is presently in early discussions with one of the world's top five pharmaceutical companies to license its proprietary technologies and to hire certain of its recently terminated highly trained and specialized technical personnel.

**D.  Proprietary Drugs**

16. In addition to its Dynamic Proteomics Platform, the Debtor owns or licenses its own proprietary molecules and drugs for development. Those molecules include Ghrelin for treating involuntary weight loss and with an initial clinical program that has already been approved by the Federal Drug Administration ("FDA") for entry into Phase 2 clinical trials in Lou Gehrig's Disease ("ALS"); and Nascopine, also for ALS, which was granted "orphan drug status" by the FDA (meaning, status granted to drugs for rare diseases that are entitled to market exclusivity and accelerated approval benefits) in December 2015. The Debtor believes both compounds hold great promise; however Nascopine requires further testing before it enters clinical development, and both compounds require outside financing in order to be advanced.

17. Ghrelin is an appetite-stimulating agent and growth hormone for treating involuntary weight loss in ALS and in the elderly, among other conditions. Ghrelin is licensed to the Debtor by Biopharma Forest, Inc., under an exclusive license that permits assignment in certain circumstances. In addition to the compound's FDA approval of testing for treatment in ALS, Ghrelin has additional potential uses in treating weight loss associated with anorexia of aging, chronic obstructive pulmonary disease, and patients in intensive care due to hip fracture.

18. The Debtor believes that development of Ghrelin, using in part the Debtor's Dynamic Proteomics Platform, will take several years of clinical testing, and will require substantial capital not yet available to the Debtor.

**E.  Debtor's Finances**

19. Over the course of roughly 15 years, the Debtor has raised approximately $68 million in equity contributions from roughly 480 shareholders. The Debtor has used those funds in

5
DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING AND GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS

Case: 16-41241    Doc# 17    Filed: 05/06/16    Entered: 05/06/16 14:04:41    Page 5 of 19

developing its Dynamic Proteomics Platform, licensing Ghrelin and other drugs, and operating its fee-for-service business.

20. In 2014, the Debtor's total revenues were $5,363,000, and in 2015, the Debtor's total revenues were $4,907,000.

21. In addition, in December 2014, the Debtor entered into a loan agreement (the "Loan Agreement") with Midcap Financial Trust, as successor agent to MidCap Funding V, LLC ("MidCap"), to advance funds of up to $6,000,000, primarily to cover the costs of an anticipated initial public offering ("IPO"), after having failed in an earlier attempt at an IPO offering, and to fund ongoing costs of operations and an internal restructuring. The loan was (and is today) secured by all of the Debtor's tangible and intangible personal property.

22. Debtor's earlier IPO attempt was cancelled in June 2014, due to potential IPO investors' responses that indicated that the Debtor needed to achieve stronger evidence of having its own drug assets to develop, and of having achieved downstream milestones from successfully advancing its partner's compounds, in order to complete a successful IPO. Funds advanced by MidCap were therefore used to fund continuing operations of the Debtor to secure its own compounds to advance, and to facilitate the marketing of the Dynamic Proteomics Platform to biopharmaceutical company partners, as described above.

### F.  Impending Insolvency

23. Because the Debtor's operations continued to suffer losses through the end of 2015, and after deliberations with MidCap and others, the Debtor reduced its employee count in December 2015 from 50 to 24 personnel, and concentrated on compensated work in the areas of muscle and fibrotic diseases. The reduced headcount allowed the Debtor to retain a focused and critical core of employees to execute on the Debtor's existing contracts, while reducing payroll expense and continuing the attempted marketing and sale of the fee-for-service business to a CRO.

24. When the search for a CRO buyer failed, the Debtor was confronted with diminishing cash for operations and an inability to continue active work on existing contracts without additional funding. The Debtor therefore approached MidCap and requested additional funding for a short period in which to market the company further, but MidCap refused. Accordingly, as of April 15,

2016, the Debtor terminated all remaining employees, and paid to departing employees all owed wages and related benefits (other than certain bonuses owing to officers and directors).

### G. Default With MidCap

25. On March 28, 2016, MidCap declared a default under the Loan Agreement, based on MidCap's determination that the Debtor's ability to repay advances from MidCap had been materially impaired. Further, on April 12, 2016, MidCap served on the Debtor notice of an intended foreclosure sale of the Debtor's assets, scheduled for May 5, 2016.

26. Despite continued discussions between the Debtor and MidCap thereafter, no agreement could be reached to defer MidCap's noticed sale on a consensual basis, and therefore, on May 4, 2016, the Debtor filed its petition in order to prevent the foreclosure sale from proceeding.

### H. Debtor's Assets and Liabilities

27. As of the Petition Date, the Debtor's assets consisted primarily of the following:

(a) Numerous patents, licenses and other intellectual property related to the Dynamic Proteomics Platform, its fee-for-service business and proprietary drugs. The value of those assets is undeterminable at this time, though if fully developed they could be valued at amounts well in excess of the invested capital of $68 million. In liquidation, however, those assets are likely worth minimal amounts, particularly licenses that cannot be transferred in such circumstances.

(b) Various office furniture and equipment, as well as scientific testing equipment subject to capital leases, having a scheduled value of approximately $900,000 (at book value).

(c) Accounts receivable of approximately $200,000.

(d) Cash or equivalents of approximately $45,000.

(e) Inventory, consisting of certain tracer isotopes, having a value of approximately $150,000.

28. The Debtor does not own any real property and occupies its present facility in Emeryville, California pursuant to a lease. That lease is scheduled to expire in August 2017, but the lessor has agreed to waive all rent obligations after April 1, 2016 provided that the Debtor vacates the premises no later than June 30, 2016.

29. As of the Petition Date, the Debtor's liabilities consisted of the following, in approximate amounts:

    (a) Secured debt of approximately $3,800,000 owing to MidCap and secured by all the Debtor's personal property.

    (b) Priority claims of approximately $65,000, consisting primarily of the priority portion of earned bonuses owed to former employees, including insiders.

    (c) General unsecured claims of approximately $3,300,000, including trade claims and earned bonuses of former employees.

30. The Debtor believes that in the event of a complete liquidation, there will be little or no recovery for either MidCap or unsecured creditors, given the nature of the Debtor's primary assets, its intellectual property. However, the Debtor also believes that in a successful reorganization as described below, MidCap may be paid in full and unsecured creditors may receive payment of most or all of their claims.

## I. Intended Chapter 11 Strategy

31. The Debtor's present strategy for operating in, and exiting from, its chapter 11 case consists of the following elements:

    (a) The Debtor intends to operate with a skeletal staff, costing roughly $30,000 to $65,000 per month, including outside consultants and investment bankers as needed.

    (b) The Debtor's immediate objective will be to market its Dynamic Proteomics Platform to its pharmaceutical partners (rather than to CROs as before), with the goal of licensing or selling that platform in a manner that will allow the Debtor's continued use of the platform for development of its own proprietary drugs. To date, the Debtor is in encouraging discussions with one such company and hopes to expand those discussions to other potential buyers as well.

    (c) If the Debtor's efforts to sell its platform are successful, the proceeds of that sale will be used to reduce or eliminate the Debtor's secured debt to MidCap, and to fund ongoing operations if possible.

    (d) The Debtor's reorganization plan, following a sale or other disposition of its

platform, will recapitalize the company through conversion of postpetition financing into new equity in the reorganized company (with the consent of the postpetition lenders), together with the opportunity for additional equity contributions that will be extended to existing shareholders.

(e) Once the Debtor has reorganized, it will seek to develop its proprietary drugs, particularly Ghrelin and Nascopine, with the assistance of pharmaceutical partners.

**J. Proposed DIP Loan**

32. In order to fund operations during the Debtor's chapter 11 case, and to fund a retainer requested by the Debtor's general bankruptcy counsel, the Debtor has need of loans to be made on a postpetition basis. Prior to the Petition Date, the Debtor requested funding from MidCap on a postpetition basis, but MidCap declined to consider any such funding.

33. In addition, prior to the commencement of this chapter 11 case, the Debtor approached a number of financial institutions, shareholders and other credit sources, in order to request postpetition funding, either on a secured or unsecured basis. None of those parties indicated any willingness to provide the financing required by the Debtor. In fact, only the Individual Lenders were willing to make any loans to allow the Debtor to proceed with its chapter 11 process and an orderly sale process.

34. Therefore, the Debtor approached some of its largest shareholders to seek commitments to extend loans on a postpetition basis. To date, the following individuals (collectively, the "Individual Lenders") have agreed to lend funds to the Debtor on the terms described below: Dan and Pat Haffner, David Chester, Dick and Jason Polder, Ken Boyd and Jonathan Segal. None of the Individual Lenders is an officer, director or employee of the Debtor, and all are existing shareholders of the Debtor.

35. The terms of the postpetition loan (the "DIP Loan"), set forth in the Term Sheet, are summarized as follows:

(a) <u>Advances</u>. Advances will be in accordance with the budget attached to the Term Sheet, subject to modifications with the consent of the Debtor and the Individual Lenders, and will be fully due on the first anniversary of the Petition Date (or upon plan

9
DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING AND GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS

confirmation, conversion to chapter 7 or appointment of a trustee, if any occurs earlier);

(b) <u>Conditions to Continued Loans</u>. Total advances will be up to $1,000,000, but may be discontinued by the Individual Lenders in the event of any of the following: (i) if the Debtor has not entered into a contract to sell or otherwise dispose of substantial assets with the Individual Lenders' approval by July 30, 2016; if the Debtor has not filed a plan of reorganization approved by the Individual Lenders by September 30, 2016; or if advances have reached $500,000 in the aggregate and the Individual Lenders have decided to stop making advances for any reason.

(c) <u>Interest and Charges</u>. Advances will accrue interest at the rate of 10% per annum, and a one-time loan fee of $25,000 will be charged. All attorneys' fees incurred by the Individual Lenders will be added to the total amount owing under the DIP Loan.

(d) <u>Lien and Superpriority Claim</u>. The DIP Loan will be secured by a lien encumbering all assets of the Debtor other than avoidance actions, as well as a superpriority claim under Section 507(b) of the Bankruptcy Code. The lien and superpriority claim will be subordinate to all existing liens and to quarterly fees that come due to the United States Trustee.

(e) <u>Court Approval</u>. All advances are conditioned, among other events, upon the Court's approval of the DIP Agreement, by way of an interim order and final order.

(f) <u>Default Remedies</u>. In the event of a default, the Individual Lenders will be entitled to all customary remedies of a secured creditor, except that enforcement of such remedies will be stayed by the automatic stay provisions of Section 362(a) of the Bankruptcy Code. In such circumstances, the lenders will be entitled to terminate all advances under the DIP Loan, and to file and prosecute a motion for relief from stay under the provisions of Section 362(d) of the Bankruptcy Code upon shortened notice, but will not be entitled to such relief on an automatic basis.

36. It is intended that the DIP Loan will be more formally documented in a full loan agreement, and that the Individual Lenders will be replaced by a single entity, such as a limited liability company, that the Individual Lenders will own. Additional individuals and funds may also

10
DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING AND GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS

Case: 16-41241    Doc# 17    Filed: 05/06/16    Entered: 05/06/16 14:04:41    Page 10 of 19

be added to the DIP Loan, but none of those additional individuals will be officers, directors or employees of the Debtor.

37. Among the budget items that will be funded by the first advances of the DIP Loan is the amount of $250,000 to be paid to Meyers Law Group, P.C. ("MLG"), the Debtor's general bankruptcy counsel, as a retainer to be applied to fees and expenses earned either immediately before, or after, the Petition Date, in lieu of having received such a retainer prior to the Petition Date. Notwithstanding, no such payment will be made to MLG until separately approved by the Bankruptcy Court pursuant to a motion under Sections 327 *et seq.* of the Bankruptcy Code.

38. The Debtor is not seeking to use any cash collateral in which MidCap holds a lien.

39. In the Debtor's opinion, the terms of the proposed DIP Loan are fair and reasonable, and should be approved by the Court. In particular, the Debtor has been unable to obtain postpetition financing from any other source, despite active efforts to do so, whether on a secured or unsecured basis.

**K.     Compliance With Guidelines**

40. As set forth in the certification of counsel filed concurrently herewith, the terms of the DIP Loan comply fully with the provisions of the above-entitled *Court's Guidelines for Cash Collateral and Financing Motions and Stipulations* (the "Guidelines"). For example, the DIP Loan does not require any waivers of Section 506(c) charges, cross-collateralization, automatic relief from stay, extraneous findings and releases, or other provisions discouraged by the terms of the Guidelines.

### III.     RELIEF REQUESTED

41. Based upon the foregoing, the Debtor respectfully requests that the Court enter an order granting to the Debtor authority to enter into the DIP Loan on the terms summarized above, and to grant a junior lien and superpriority claim to the Individual Lenders (or their successor lending entity) to secure repayment of the DIP Loan pursuant to Sections 364(c)(1), (2) and (3) of the Bankruptcy Code.

### IV.     DISCUSSION

Based upon the following, the Debtor respectfully submits that good cause has been shown of

11
DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING AND GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS
20130.DOC/20130

Case: 16-41241     Doc# 17     Filed: 05/06/16     Entered: 05/06/16 14:04:41     Page 11 of 19

the granting of this Motion and for the relief requested herein.

### A. The Debtor Is Unable To Procure An Unsecured Loan.

The Debtor is unable to procure the funds required to operate its business during the pendency of its reorganization case in the form of unsecured credit or unsecured credit with an administrative expense priority under Section 503(b)(1) of the Bankruptcy Code. No prospective debtor-in-possession lender has expressed a willingness to lend funds to the Debtor on either such basis. The Debtor has therefore determined that it can obtain necessary postpetition financing only by granting liens and administrative expense priority to a prospective lender, pursuant to the provisions of Sections 364(c) of the Bankruptcy Code.

A debtor seeking financing under Sections 364(c) of the Bankruptcy Code must make reasonable efforts to seek sources of unsecured credit available under Sections 364(a) and (b) of the Bankruptcy Code, but "is not required to seek credit from every possible source." *In re Ames Department Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990). Here, the Debtor has made all reasonable efforts to obtain unsecured financing, but no source of sufficient unsecured credit has been made available to the Debtor. Prior to the commencement of this chapter 11 case, the Debtor approached a number of financial institutions, shareholders and other credit sources, and none were willing to provide the financing required by the Debtor. Only the Individual Lenders were willing to make a loan of the sufficient amount to allow the Debtor to proceed with its chapter 11 process and an orderly sale process, and only then on a secured loan basis. Thus, the prerequisite to secured borrowing under Section 364(c), that unsecured credit is unavailable, has been met.

### B. The Proposed Postpetition Financing Is Appropriate And Should Be Approved.

In reviewing debtor-in-possession financing arrangements, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties." *Id.* at 38. Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining the financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., Brav v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snow Shoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonable business); *Ames*, 115 B.R. at 40 ("Cases consistently reflect that the

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to the benefit the estate as it is to benefit parties in interest."). Courts generally will not override the debtor's prudent and responsible exercise of its basic business judgment consistent with its fiduciary duties to the estate and its creditors in negotiating an appropriate financing package. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgment should be left to the board room and not to this court."). Here, the Debtor has exercised its business judgment in determining that the DIP Lenders' proposed postpetition financing is in the best interests of its estate, and that the loan terms offered are favorable to its estate.

Based on the foregoing and the exercise of its best business judgment, the Debtor believes that the terms and conditions of the DIP Agreement are fair and reasonable, are the product of good faith negotiations, and should be approved.

### C. Interim Approval Is Appropriate.

As stated, the Debtor also asks that the relief sought in this Motion be granted initially on an interim basis, so that needed financing can be obtained quickly without undue delay.

Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain postpetition credit may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary hearing on such motion, on an expedited basis, and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate. Pursuant to Bankruptcy Rule 4001(c), the Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtor to obtain credit under the DIP Agreement in an amount up to $300,000. That amount has been determined by the Debtor to be the maximum borrowing balance needed to fund operation and sale proceedings of the Debtor through May 31, 2016, based upon the budget attached to the Budget.

Entry of an interim order permitting borrowing under the DIP Loan pending a final hearing is therefore in the best interests of the Debtor's estate, as it will enable the Debtor to initiate an

effective sale process, and avoid immediate and irreparable harm and prejudice to its estate.

## V. NOTICE

In anticipation of an emergency hearing of the Debtor's request for interim relief, the Debtor, through its counsel, has served notice of this motion and the anticipated hearing, by telecopy, electronic mail, overnight courier or hand-delivery, to the Office of United States Trustee for the Northern District of California, MidCap and its counsel, the Individual Lenders, the twenty (20) largest unsecured creditors of the Debtor (as identified in the lists filed pursuant to Bankruptcy Rule 1007(d)), all other creditors known to the Debtor to have liens against the Debtor's assets, and all parties who have filed notices of appearances in these cases.

In light of the expedited and interim nature of the relief requested herein, the Debtor submits that no further notice is required for the entry of the interim order hereby requested. Upon entry of the interim order, the Debtor will serve copies of the Motion, the interim order and/or a notice of the final hearing of the Motion upon all necessary parties as identified in the interim order.

No previous application for the relief sought herein has been made by the Debtor to this or any other court.

## VI. CONCLUSION

WHEREFORE, based upon all of the foregoing, the Debtor respectfully requests that this Court enter an order granting the relief herein requested, as set forth in Section III above.

DATED: May 6, 2016

MEYERS LAW GROUP, P.C.


By    /s/ Merle C. Meyers
      Merle C. Meyers, Esq.
      Attorneys for Kinemed Inc., Debtor

# EXHIBIT A

1  MEYERS LAW GROUP, P.C.
   MERLE C. MEYERS, ESQ. CA Bar #66849
2  MICHELE THOMPSON, ESQ. CA Bar #241676
   44 Montgomery Street, Suite 1010
3  San Francisco, CA  94104
   Telephone: (415) 362-7500
4  Facsimile:  (415) 362-7515

5  Prospective Counsel for Debtor,
   KINEMED, INC., a Delaware Corporation
6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>KINEMED, INC., a Delaware corporation,<br><br>                    Debtor.<br><br><br>Federal Tax I.D. No.: 91-2104596 | Case No. 16-41241-RLE<br><br>Under Chapter 11<br><br>Date:   May 11, 2016<br>Time:   2:00 p.m.<br>Place:   U.S. Bankruptcy Court<br>            Courtroom No.220<br>            1300 Clay Street<br>            Oakland, California<br>Judge:   Hon. William J. Lafferty |

**INTERIM ORDER GRANTING DEBTOR'S MOTION
FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING,
AND (B) GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS**

On May 4, 2016 (the "Petition Date"), KINEMED INC., a Delaware corporation and the debtor-in-possession herein (the "Debtor"), filed a voluntary petition seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), initiating the within chapter 11 case.

On May 6, 2016, the Debtor filed its *Motion For Authority To (A) Obtain Secured Postpetition Financing, And (B) Grant Postpetition Liens And Superpriority Claims* (the "Motion"), seeking the entry of an interim and final order, pursuant to the provisions of Sections 364(c)(1), (2) and (3) of the Bankruptcy Code and Rule 4001(c)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), permitting the Debtor to (a) obtain secured postpetition financing, and (b) grant postpetition liens and superpriority claims to secure such financing.

The Motion came before this Court for an emergency hearing on May 11, 2016 in Oakland,

California, for the purpose of considering the granting of interim relief pending a later, final hearing on full notice to all necessary parties. Merle C. Meyers, Esq. of Meyers Law Group, P.C. appeared on behalf of the Debtor at said emergency hearing, and other appearances were made as noted in the record of the hearing. Having heard all argument and evidence presented with respect to the Motion and any opposition thereto, the Court has determined that just cause exists for the granting of the Motion on an interim basis to the extent set forth below, and for good cause shown,

NOW, THEREFORE, IT IS HEREBY ORDERED, DECREED AND ADJUDGED, for the reasons set forth in the record of the aforementioned hearing and in the Motion, as follows:

1. Pursuant to the provisions of Sections 364(c)(1), (2) and (3) of the Bankruptcy Code, and Rule 4001(c)(1) of the Bankruptcy Rules, the Motion is hereby GRANTED on an interim basis to the extent set forth below.

2. The Debtor is hereby authorized on an interim basis to obtain secured postpetition financing from the Individual Lenders[1] pursuant to the terms of the Term Sheet, up to the aggregate amount of $300,000.

3. The Debtor is hereby authorized to grant to the Individual Lenders, in order to secure the Debtor's obligations arising under the Term Sheet (to be followed by a formal loan agreement), (i) valid and perfected liens and security interests in and upon any and all present and future personal property of the Debtor's estate, whether now owned or hereafter acquired, excluding any avoidance claims held by the estate herein, subject to all existing valid and enforceable liens and subject to subordination in favor of quarterly fees owing to the United States Trustee as provided in the Term Sheet; and (ii) an administrative expense claim with respect to all of the Debtor's obligations arising under the Term Sheet having administrative expense priority over any and all other administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

4. The Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Term Sheet, including without limitation the negotiation and execution of formal loan agreement and security agreement, subject to further approval by

---

[1] All capitalized terms, unless otherwise defined herein, shall have the meanings ascribed to them in the Motion.

| | |
|---|---|
| 1 | this Court, *provided, however*, that the Debtor may not borrow in excess of $300,000 under the terms of the |
| 2 | DIP Loan pending further order of this Court. |
| 3 |      5.    A final hearing of the Motion shall be conducted by this Court on _____, 2016, at |
| 4 | _____ a.m. or as soon thereafter as counsel may be heard, in the Courtroom \_\_\_\_ located at 1300 Clay |
| 5 | Street, Suite 300, Oakland, California 94612. |
| 6 |      6.    Notice of the final hearing of the Motion and the entry of this interim order shall be given by |
| 7 | the Debtor, through its counsel, by first class United States mail to (a) the Office of the United States |
| 8 | Trustee, (b) Midcap and its counsel, (c) the DIP Lenders' counsel, (d) the twenty (20) largest unsecured |
| 9 | creditors of the Debtor (as identified in the lists filed pursuant to Bankruptcy Rule 1007(d)), (e) all other |
| 10 | creditors known to the Debtor to have liens against the Debtor's assets, and (f) all parties who have filed |
| 11 | notices of appearances in this case. |

** END OF ORDER **

-3-
AND (B) GRANT POSTPETITION LIENS AND SUPERPRIORITY CLAIMS FOR AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING
30040.DOC/20022

Case: 16-41241    Doc# 17    Filed: 05/06/16    Entered: 05/06/16 14:04:41    Page 18 of 19

# COURT SERVICE LIST

Office of the U.S. Trustee
1301 Clay Street
Oakland, CA 94612

**Counsel for Midcap Financial Trust**
Christopher K. Greene
McGuire Woods
1230 Peachtree Street, N.E.
Suite 2100Atlanta, GA 30309-3534

De Lage Landen Financial Services, Inc.
1111 Old Eagle School Road
Wayne, PA 19087

Union Bank
200 Pringle Avenue
Suite 500
Walnut Creek, CA 94596